DAWKINS, J.
Plaintiffs bring this suit to recover an alleged balance due on the purchase price of a garage business in the city of De Bidder, Beauregard Parish. They claim to have sold to defendant the business on the basis of $8,000 for all their transferable rights in a certain contract with the Ford Motor Company, and for the business conducted at De Bidder, the purchaser to pay in addition thereto the invoice price of the stock of goods, accessories, and equipment; that defendant had paid $500 cash, had subsequently refused to carry out his 'agreement, and that plaintiffs had accordingly liquidated the business, giving defendant credit for the profits received, and ask for judgment for $8,000, less a credit of $500 cash paid, and a further credit of $2,510 as the profits of the business.
Defendant denied that he had purchased the business, but averred that he had paid the sum of $500 for an option thereon, to hold good until he could determine whether or not he would be able to procure the agency rights with the Ford Motor Company, the contract with plaintiffs or their vendor being nonassignable; that he failed to obtain such agency, and declined to exercise the said option.
There was judgment for defendant, and plaintiffs appeal.
The issues depend entirely upon questions of fact and the credibility of witnesses. We have reviewed the evidence, and coincide fully with the views of the district judge, expressed in the written opinion which we quote below, and adopt as our own:
“The plaintiffs are demanding of the defendant a sum of money claimed to be due as damages for the nonfulfillment of a contract to purchase at the price of $8,000, property sold by them to the defendant, and described as all of petitioners’ rights, titles and interests in and to that certain contract formerly existing between T. Henry Bedsole and the Ford Motor Company, together with the stock, business and good will of the Bedsole Motor Company. It is alleged that the sale of all this property was made orally, on May 4, 1917, the consideration for the contract rights being $8,000, and for the remaining property about $6,000, but only the sale of the contract rights is involved in this litigation.
“The case involves almost wholly questions of fact; and these facts, must be deduced from statements of several conversations, particularly what was said at the meeting when the contract of sale is claimed to have been entered into, and from a few circumstances surrounding the parties and the subject-matter.
“There is no dispute that the contract was entered into, verbally, at the Lake Charles garage of Tom Bedsole, on May 4, 1917, and that there were present Tom Bedsole, Henry Bedsole, the two plaintiffs and the defendant. The dispute is as to the nature of the contract. The plaintiffs claim that a sale of the rights under the Ford contract was made for $8,000, of which $500 was paid in cash, and the balance was payable upon the return of the defendant from New Orleans, where he contera plated going to secure for himself, if possible, the rights granted to Bedsole under the con tract which formed the subject-matter of th<¡ negotiations. The defendant claims that the contract between himself and the plaintiffs was an option or privilege to purchase, and that he intended to exercise his option only in case of his success in obtaining the Ford rights from the New Orleans representatives of the Ford Company. The accounts of the conversation at the Bedsole garage and the final .supposed agreement of the parties, differ radically; and properly to weigh the conflicting testimony it is necessary to review the circumstances leading up to the meeting.
“Tom Bedsole .was' the agent of the Ford Motor Company at De Bidder, and Henry Bed-sole at Lake Charles, each under a contract not transferable without the consent of the Ford Company. They exchanged territories, without making any formal transfers of the contract rights, and continued the two businesses as though no change had occurred. On April 27, 1917, Henry Bedsole disposed of his garage and Ford business at De Bidder to the plaintiffs. There was no attempt to secure the con *491 sent of the Ford Company to the substitution of new agents, and as a matter of fact the plaintiffs acquired. no rights whatever under the Ford contract. Whether they knew this, fact, and took the chance .of subsequently acquiring such rights directly from the company, was the subject of considerable testimony.
“Plaintiff Fruge says on this point:
“ ‘Q. At the time you purchased this business from Mr. Henry Bedsole, did he assure you that you would be able to operate under the Ford contract with the consent of the Ford Motor Company?
“ ‘A. He did not assure that I could operate that contract.
“ ‘Q. Was that phase of the contract discussed between you people?
“ ‘A. It was.’
“On cross-examination he says:
“ ‘Q. At the time you purchased from Henry Bedsole, did you know that his contract with the Ford Motor Company was nonassignablc?
“ ‘A. I did not see the contract at the time, and don’t know.
“ ‘Q. When did you first find out that the contract was nonassignable by Mr. Bedsole?
“ ‘A. Some time after that.
“ ‘Q. How long would you say?
“ ‘A. It was not but a few days.
“ ‘Q. Did you find out before the negotiations with Mr. Roberts commenced?
“ ‘A. Sometimes along about that time.’
“On the same point, plaintiff Lyles testifies:
“ ‘Q. Did you know at the time you purchased from Mr. Bedsole that you would have to get the consent of the Ford Motor Company to operate?
“ ‘A. I didn’t at that time.
“ ‘Q. How long after that? .
“ ‘A. A short time — it was some time before we read the contract.
“ ‘Q. Was it before you entered into negotiations with Mr. Roberts?
“ ‘A. I will not be sure.
“ ‘Q. Before the sale to Mr. Roberts?
“ ‘A. I believe it was.’
“Henry Bedsole, as witness for the plaintiff, avoided saying whether Lyles and Fruge knew the character of the rights ho was. transferring to them; and on cross-examination said he did not recollect whether he had taken steps to prevent Lyles from going to New Orleans before the deal was closed, in order to learn from the Ford Company the real rights of Bed-sole to transfer his contract.
“It is clear from this testimony that the plaintiffs dealt with Bedsole in ignorance of the restriction of his contract which he knew existed, and of which he was in duty bound to inform them. In effect, he obtained from them $8,000 without any consideration whatever, unless possibly he placed them in a more favorable situation for future dealings with the Ford Company. It is equally clear that the plaintiffs became informed of the true state of affairs about the time they began negotiations with Roberts, and that Roberts himself knew the situation before dealing with the plaintiffs.
“Under these circumstances, the plaintiffs; were evidently anxious to escape the results of their bargain with Bedsole. Within less-than a week of their deal with him, they were offering to step out of the business without a profit. It appears to have been understood' that even the profits of the conduct of the garage during their occupancy should be accounted for to Roberts, in order to reimburse him for a commission he agreed to pay to Tom Bedsole for assisting him in procuring the agency rights from the Ford Company. Whether the plaintiffs knew of this arrangement to pay Bedsole the commission does not positively appear; but it is at least fairly evident that in case of transfer to Roberts he was to have the earnings of. the business from the date of the original transfer from Henry Bedsole.
“Mr. Roberts was desirous of acquiring the Ford agency, even at the time the plaintiffs and Henry Bedsole had their transaction. Bed-sole says that on the way to Lake Charles when he was going to close the deal with the plaintiffs, Roberts said if they fell down on it he yould be glad to consider it. Later in his testimony, he says Roberts agreed ‘to take it if they did not take it.’
“Roberts’ account of this conversation is: ‘He told me about selling to Fruge & Lyles, and I told him if the deal did not go through I would talk to him about the deal, but I would have to go to New Orleans and see the Ford Motor Company, and see if I could get the contract, but I would consider it; and he laughed and told me we would not trade.’
“Roberts’ account of the conversation is by far the more reasonable. It is, moreover, consistent with his own conduct throughout, as-, well as with that of Bedsole, who sold to the’ plaintiffs what he did not possess, and took precautions to prevent them from discovering the deception until after he had the money.
“According to Fruge, the first talk between him and Roberts looking to the sale to Roberts was in front of the garage at De Bidder on May 1, three or four days after the plaintiffs had acquired the business. He quotes Roberts 'as saying: T have come to buy you *493 out.’ Roberts wanted to know when they could turn over the business (at the price they had paid), and about the 14th was agreed on, ‘and he said he would go see Mr. Tom Bedsole at Lake Charles about it.’ Later, the witness says that Roberts did not on that occasion express himself as being willing to enter into the agreerhent if he knew that he could get the Ford contract. Lyles’ account of the conversation is somewhat different. He quotes Roberts as saying that if he had any assurance of securing the Ford contract he would not mind taking the proposition, and he says that he replied that he and Frug'e had taken that chance, and if they had the contract they would not take $20,000 for it, whereupon Roberts said he would see Tom Bedsole at Lake Charles about it.
“Three or four days after this conversation, occurred the meeting at Lake Charles, at which the contract between the plaintiffs and the defendant was entered into. It is evident that the plaintiffs went there with the view of escaping, if possible, from a dangerous situation, and that the defendant was fully informed of that situation, and had thus far avoided committing himself to a purchase of any of the property unless he could acquire the Ford agency rights, with the consent of the Ford Motor Company. The question is, Did he commit himself at that time to the purchaser, as contended for by the plaintiffs?
“There were present at the meeting the plaintiffs and the defendant, the two Bedsoles and Mr. Ike Williams. The meeting lasted a long time, some of the parties going and coming, and Tom Bedsole looking after his garage business. His testimony is of no value in determining what happened. He says, however, that he thought that Roberts agreed to buy out the boys, whether he got the contract from the Ford Company or not.
“The two plaintiffs and Henry Bedsole all agree that the contract entered into was an absolute sale of whatever rights the plaintiffs possessed, whether transferable or not. Bed-sole’s account of the meeting is that after long negotiations, during which a telephone conversation was held with a local attorney as to the legal effect of an oral agreement, he called all the parties together, and stated the agreement as he understood it, and they all assented to his statement. He testifies:
“ T just said, “Gentlemen, this agreement under which Mr. Roberts gives you $8,000 for this agency whether he secures it or not, and is to pay $500 and $7,500 when he returns from New Orleans.”
“ ‘Q. Do you remember whether Mr. Roberts made any declarations as to whether that was the way he understood it?
“ ‘A. He said it was all right.’
“The witness further says that all of the men ‘walked out,’ and he made his statement, remarking that he and his brother Tom would be witnesses, and that he then left. It is to be noted that Tom Bedsole does not recall this circumstance, and that Mr. Williams, a disinterested witness, as well as Mr. Roberts, says that it did not occur. Mr. Williams come in late, when the negotiations had apparently reached a point where the parties could not agree. He wanted to go home, but Roberts told him to wait a while, that he would be through soon, that he had done all he was going to do; and Roberts and the witnesses then went and sat in a car. Mr. Bedsole then called Roberts, and he went to the office and wrote a check in view of the witness, while Henry Bedsole went outside after the car. No statement of the agreement was made by Henry Bedsole in the presence of the witness.
“Fruge recounts the occurrence practically in the words testified to by Bedsole. Lyles goes more into detail, leading up the final statement by Henry Bedsole, ‘Me and Tom are witnesses, and that is a deal. Regardless of your getting the contract, you are due this.’ He also says that Roberts agreed to the statement. The attitude of both plaintiffs throughout the negotiations at the Bedsole garage is well illustrated by the following testimony of Fruge on cross-examination:
“ ‘Q. You objected right along that he should not go to Now Orleans?
“ ‘A. Yes. His agreement was that he pay $8,000 for the rights we had.
“ ‘Q. And you wanted his $8,000 before he went to New Orleans?
“ ‘A. I wanted it closed up.’
“Mr. Roberts insists that nothing was said at this meeting obligating him as a purchaser, but that it was agreed throughout that the $500 cheek was given for his right to purchase if he found on his visit to New Orleans that he could acquire the Ford agency. He gives practically the same account of the closing of the deal testified to by Williams. He went to New Orleans the same night, and secured a noncommittal interview with the Ford representatives. Pie made a second trip, and met a positive refusal. Further negotiations then occurred between him and the plaintiffs which it is not necessary to recount, and subsequently the plaintiffs themselves went to New Orleans and secured the contract in their own name.
*495 “That plaintiff Fruge did not understand that he had made a final sale to the defendant is indicated by a conversation between him and the witness Knight, at that time a mechanic employed by plaintiffs. He says that Fruge told hiim, after his return from the Lake Charles meeting, that he believed the deal would go through; and about a week later, after Roberts’ return from New Orleans,, the witness asked, ‘If the deal does not go through, will Mr. Roberts lose his money?’ and Fruge answered, T don’t know.’
“Considering the circumstances of the case, there is not a preponderance of evidence favoring the contentions of the plaintiffs. They rely upon the testimony of themselves and Henry Bedsole, in attempting to recount a long, disjointed conversation, interrupted many times, and ending in a scene which Tom Bedsole cannot recall and which Roberts and the witness Williams deny. They were trying to dispose of something which had little, if any, value to a man who showed by all his previous conduct that he did not propose to pay out his money for such property, and who is evidently a business man with fair ideas of value. In such a case, the presumptions are exceedingly strong that an intelligent man will not make a contract so evidently to his disadvantage. This presumption, with the positive and circumstantial evidence in the case, overthrow the contentions of the plaintiffs.”
For the reasons assigned, the judgment-appealed from is affirmed, at the cost of appellants.